[L. A. No. 16384. In Bank.—January 5, 1939.]

MARY PICKFORD COMPANY (a Corporation) et al., Plaintiffs and Appellants, v. BAYLY BROTHERS, INC. (a Corporation), et al.,.Defendants and Appellants.

504

Mott, Vallee & Grant and Paul 'Vallee for Plaintiffs and Appellants.

Swanwick, Donnelly & Proudfit, Finlayson, Bennett & Morrow, John W. Preston and Chapman & Chapman for Defendants and Appellants.

W. H. Orrick, T. W. Dahlquist and Orrick, Dahlquist, Neff & Herrington, as *Amici Curiae,* on Behalf of Defendants and Appellants.

THE COURT.—Bayly Brothers, Inc., Harold Bayly, Roy D. Bayly, Edwards & Wildey Company, Suburban Estates, Inc., and California Trust Company have appealed from a judgment by which they were held liable for the amount paid by the plaintiffs for a beneficial interest under a certain declaration of trust which was issued and sold without a permit from the commissioner of corporations. The plaintiffs also are dissatisfied with the judgment, and upon their appeal claim interest in a larger sum than was allowed.

The controversy arose out of a real estate subdivision project initiated by Bayly Brothers, Inc., in 1925. That corporation made a contract for the purchase of a large tract of land and conceived a plan for financing the enterprise by means of a trust which it termed a syndicate. Edwards & Wildey Company joined it in this undertaking. They formed Suburban Estates, Inc., and a contract was made between

the three corporations in which it was agreed that, when the property was purchased, title should be conveyed to California Trust Company and held by it under a declaration of trust. The plan contemplated that the required capital should be secured from a loan of $800,000 to be made by California Bank and the proceeds of the sale of beneficial interests in the trust to be created.

In October, 1925, and while these plans were still in a promotional stage, at the solicitation of Bayly Brothers, Inc., Charlotte Pickford Smith, on behalf of Mary Pickford Company, a copartnership, subscribed for a $25,000 interest in the syndicate. The amended agreement signed by Mrs. Smith provides that the real estate to be acquired shall be held in trust by a responsible trust company and that each subscriber shall receive a certificate of beneficial interest in the syndicate in that proportion thereof as the amount of his subscription bears to an amount afterwards fixed at $490,000. On October 31, 1925, $2,500 was paid to Bayly Brothers, Inc. In the following December a check payable to California Trust Company was delivered to it as the balance of the investment.

The declaration of trust which constitutes the means by which the plan of the subdividers was carried out was executed by the trustee on December 24, 1925. It names Bayly Brothers, Inc., and Edwards & Wildey Company as beneficiaries and contains detailed provisions concerning the improvement, subdivision and sale of the property and the application of all income therefrom. It states how the profits of the venture are to be divided and provides: ''The Beneficiaries herein named, and each of them, shall have the right and privilege of dividing their beneficial interest hereunder and of assigning and transferring portions thereof, subject to all the terms, conditions, obligations and provisions thereof, but no sale or transfer of any interest hereunder shall be valid or binding upon the Trustee until an executed original of such transfer in form satisfactory to the Trustee has been delivered to it, . . . '' In February, 1926, Bayly Brothers, Inc., and Edwards & Wildey Company executed an instrument purporting to assign to Mary Pickford Company, a corporation, which had succeeded to the rights of the partnership, ''an undivided 25/490 beneficial interest of the Beneficiaries in, to and under the certain Declaration of Trust executed by California Trust Company''.

Mary Pickford Company accepted this assignment and the trustee, by an endorsement upon the certificate, acknowledged receipt of a duplicate of the assignment and of the acceptance.

The complaint is in four counts, the first of which alleges the facts concerning the issuance and sale of the certificate of beneficial interest purchased by Mary Pickford Company. It also charges that the defendants, for the purpose of inducing that company and its assignor to make such investment, represented that the beneficial interest to be vested by said declaration of trust in Bayly Brothers, Inc., and Edwards & Wildey Company would be valid and genuine, and that the defendants would be able to lawfully issue and sell undivided parts of such interests; on the contrary, such issuance and sale was illegal and void because the commissioner of corporations had given no permit therefor. There is a further allegation that the beneficial interests were and are void and of no value.

By other averments of the complaint the plaintiffs declare that neither the Mary Pickford Company nor its assignor discovered the falsity of any of the false and fraudulent representations until January, 1932. This is more than six years after the purchase. During this time, so the plaintiffs state, neither Charlotte Pickford Smith nor Mary Pickford Fairbanks nor their corporation had any knowledge or information that the representations were false. They explain that in the latter part of 1931 they were threatened with an assessment upon these beneficial interests. An investigation by a committee of investors other than the plaintiffs was then made, and the facts concerning the issuance and sale of the interests were given to the plaintiffs "by a member of said committee or by a supposed owner of beneficial interests in said trust".

Actual fraud is charged in the second and third counts of the complaint. The plaintiffs claim that for the purpose of inducing them to make the investment, the defendants represented that Bayly Brothers, Inc., would subscribe and pay for at least $50,000 face value of interests in the proposed trust and that it would not sell or dispose of those interests without notifying Charlotte Pickford Smith and Mary Pickford Fairbanks and giving them an opportunity to dispose of their interests at the same time. Allegations concerning the falsity of the representations, lack of knowledge by the plaintiffs of the true facts, and the time when and the man-

ner in which the truth was learned are in substantially the same form as those of the first cause of action. A common count for $25,000 follows.

The findings of the trial court uphold these allegations and also declare that Harold Bayly and Roy D. Bayly, who were, at all times during the transactions in controversy, officers of Bayly Brothers, Inc., knowingly joined with that corporation in assisting it and the other defendants in issuing and selling the beneficial interests. Upon these findings the court concluded that the plaintiffs should recover from Bayly Brothers, Inc., Harold Bayly, Roy D. Bayly, Edwards & Wildey Company, Suburban Estates, Inc., and California Trust Company $25,000 with interest from January 7, 1933, the date of a demand for payment, and rendered judgment accordingly.

Bayly Brothers, Inc., contends that the evidence does not fairly sustain the finding of the trial court concerning actual fraud on its part. However, by a plan conceived at the outset, this corporation together with Edwards & Wildey Company contrived to reserve a large share of the possible profits of the venture for themselves without any investment of capital. The purchase price agreed to in the option was $1,300,000 and by transferring this option to Suburban Estates, Inc., their dummy corporation, for $1,450,000 they obtained a bookkeeping credit of $150,000. In addition Bayly Brothers, Inc., and Edwards & Wildey Company received 98,000 shares of stock issued by Suburban Estates, Inc., as consideration for the assignment of the contract for the purchase of the real property proposed to be subdivided. They retained one-half of this stock and transferred the remainder to the syndicate trustee for distribution among the purchasers of the certificates of beneficial interest. When title to the land was transferred to the trust company, the $150,000 credit was used by Bayly Brothers, Inc., and Edwards & Wildey Company to purchase certificates of beneficial interests in that amount. The plaintiffs and other purchasers of beneficial interests paid $340,000 in cash for the capital of the enterprise. Of this sum Bayly Brothers, Inc., took $40,-000 in payment for the loss of profit it claimed because of the cancellation of a contract under which it agreed to underwrite a bond issue, paying one-half of this amount to the co-underwriter.

■ In the purchase of their beneficial interest, the plaintiffs dealt only with Bayly Brothers, Inc. There is evidence that the officers of the company led then to believe that $1,450,000 was the price to be paid under the option, and there was a positive representation that Bayly Brothers, Inc., would make a cash investment of $50,000 in the property. The plaintiffs refused to subscribe unless this representation was put in writing, and accordingly Bayly Brothers, Inc., wrote them a letter stating that it would subscribe and pay for beneficial interests in the trust to the amount of $50,000. It is urged that because this letter stated that the company "made a profit on the sale of the property to Edwards & Wildey Co., and we expect to make a profit from the underwriting of the bonds", the plaintiffs cannot now complain of the transaction. But the statement relied upon is itself false for no profit had been made on any sale to Edwards & Wildey Company. Moreover, the representations concerning the amount of money which Bayly Brothers, Inc., would invest in the enterprise were made at a time when its officers knew that the company would receive certificate of beneficial interest in the trust to the amount of $75,000 without the payment of any money.

■ The defendants argue that Bayly Brothers, Inc., and Edwards & Wildey Company might legitimately have taken their profit of $150,000 in cash and then have used the cash to purchase the beneficial interests, but that in so doing they would merely be performing an idle act. However, this argument erroneously assumes that there was a profit. Suburban Estates, Inc., was the completely dominated instrumentality of the other two corporations, and as the trial court described the sale of the option, "there were not two sides to that transaction". Furthermore, in the report of the deputy commissioner of corporations, made on the application of Suburban Estates, Inc., to issue stock, it was said: "Applicant also has agreed to pay these two companies (Bayly Brothers, Inc., and Edwards & Wildey Company) $150,000 in cash to be paid out of profits *when said ranch is subdivided*." Nor does the statement contained in the syndicate agreement to the effect that the price for the land included a commission to the promoters negative the proof of fraud. ■ The chief factor which persuaded the plaintiffs to make the investment was the representation that Bayly Brothers, Inc., was willing to assume the risk of in-

vesting money for the subdivision and sale of the property. However, the evidence conclusively shows that it not only risked no money, but took $20,000 out of the transaction. These facts amply support the finding that the company made a promise without any intention of performing it.

■ Bayly Brothers, Inc., also seek to avoid liability for their representations upon the ground that the causes of action based thereon are barred by the statute of limitations. But section 338 of the Code of Civil Procedure, which fixes three years as the period within which an action for relief against fraud may be commenced, also provides that "the cause of action in such case is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake". According to the finding of the trial court, which is amply supported by the evidence, the plaintiffs had no knowledge that Bayly Brothers, Inc., had not subscribed and paid for at least $50,000 worth of beneficial interests until early in 1932. The action was commenced within three years thereafter. There was nothing in the declaration of trust which would create a suspicion that Bayly Brothers, Inc., had not paid in cash for the interest it had acquired and the books of the trust showed certificates to an amount of $75,000 standing in the name of that corporation. While the facts concerning the manner in which these certificates were acquired could have been ascertained by an examination of the trust records, no duty rested upon the plaintiffs to make such an investigation. "Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances 'a prudent man' would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery." (*Tarke* v. *Bingham*, 123 Cal. 163, 166 [55 Pac. 759].)

The attack on the judgment, in so far as it rests upon the finding that the defendants are liable to the plaintiffs as buyers of a security issued without a permit of the commissioner of corporations, is made on a number of grounds. California Trust Company contends that under the Corporate Securities Act as that statute existed in 1925 and 1926 (Stats. 1917, p. 673, as amended) it was not required to obtain a permit for the issuance or sale of any security; that no security was offered to the public and it assumed

no duty to the plaintiffs; and that it cannot be liable because it disbursed the money paid by subscribers before it had any knowledge that a required permit had not been obtained. The other appellants found liable by the judgment also argue that the trust company did not require a permit and that its immunity protects them. A further claim is that the certificates of beneficial interest are not securities and were not offered or sold to the public. Other reasons advanced as grounds for reversal of the judgment are: None of the defendants knew that a permit was required; under the subscription agreement the plaintiffs were vicariously parties to any wrong and are estopped from recovery; and for various reasons the findings are not supported by the evidence. The defendants also urge that a recovery upon the ground that the certificates of beneficial interest were sold without a permit of the commissioner of corporations is barred by the statute of limitations.

At the time of the transactions now questioned, the Corporate Securities Act, *supra*, defined a "security" as "Any instrument offered for sale, or sold, or issued, to the public by any company evidencing or representing any right to participate or share in the profits, earnings or income, gross or net, derived from the assets, or any thereof, of any business carried on for profit or in the distribution of such assets. . . . " (Sec. 7[d].) It also provided that the word "company" shall include all domestic and private corporations (with certain exceptions), and the word "trust" "all voluntary trusts, as the same are defined in the Civil Code, expressly created by or declared in an instrument in writing, other than a will or a judicial writ, order, decree, or judgment, to carry on any business or to secure the payment or repayment of money". (Secs. 3, 4.) Under another provision of the statute, "Every security issued by any company, without a permit of the commissioner authorizing the same then in effect, shall be void." (Sec. 12.) It also made "Every company which shall directly or indirectly issue or cause to be issued any security contrary to the provisions of this act" and "Every officer, agent, or employee of any company, and every other person, who knowingly authorizes, directs, or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security," in nonconformity with the requirements, guilty of a public offense. (Secs. 13, 14.)

The declaration of trust issued by California Trust Company named Bayly Brothers, Inc., and Edwards & Wildey Company as beneficiaries and vested in them the entire beneficial interest in the trust. They in turn sold and delivered to the plaintiffs and others certificates executed by them but not by the trust company. That sold to the plaintiffs purported to transfer to Mary Pickford Company an undivided 25/490 of the beneficial interest of Bayly Brothers, Inc., and Edwards & Wildey Company in the trust. This constituted the issuance of a security; it was a new interest created by Bayly Brothers, Inc., and Edwards & Wildey Company in the property owned by them. Unquestionably the certificates executed by Bayly Brothers, Inc., and Edwards & Wildey Company were securities within the meaning of the Corporate Securities Act. (*People* v. *Ferguson,* 134 Cal. App. 41 [24 Pac. (2d) 965]; *People* v. *Craven,* 219 Cal. 522 [27 Pac. (2d) 906]; *In re Girard,* 186 Cal. 718 [200 Pac. 593]; *Barrett* v. *Gore,* 88 Cal. App. 372 [263 Pac. 564].)

These conclusions make it unnecessary to determine whether in 1925 and 1926 a trust company organized and licensed to do business under the Bank Act of this state (Stats. 1909, p. 87, as amended) was required to obtain a permit for the issuance of a security as defined by that statute. The security sold to the plaintiffs was issued by Bayly Brothers, Inc., and Edwards & Wildey Company. True, the trial court found that money paid to the trust company by various purchasers of the certificates of beneficial interest was not received by it solely as an escrow holder, but "as a substantial part and portion of the general scheme to issue and sell" them. But the facts concerning the execution and delivery of the declaration of trust and the certificates are undisputed. Therefore, the finding of the trial court that the trust company issued them is only a conclusion of law which was incorrectly drawn from the admitted facts and must be disregarded. The evidence shows that the trust company did not execute the certificates of fractional interest nor did it have any interest in the property represented by them. Under such circumstances it clearly was not a co-issuer of the certificates.

The fact that the trust agreement provided that no assignment would be "valid or binding *upon the trustee* until an executed original of such transfer in form satisfactory to

the trustee had been delivered to it'' does not negative this conclusion. Obviously the purpose of the provision requiring notice to be given to it of assignments of the beneficial interest in the trust was to protect assignees under the rule that notice to the obligor determines priority between successive assignees. Such notice was not necessary to the acquisition of title by the assignee (*Baumgarten* v. *California Pacific T. & T. Co.,* 127 Cal. App. 649, 657 [16 Pac. (2d) 332], and cases there cited).

It is also contended that even if the certificates of beneficial interest are securities, they were not sold to the public, hence the defendants were not subject to the regulations imposed by the Corporate Securities Act. However, the record shows that Harold Bayly, Roy D. Bayly, James Dunham, Godfrey Edwards and Otto Wildey, the principal officers of Bayly Brothers, Inc., and Edwards & Wildey Company, solicited and took subscriptions for them, the sale to the plaintiffs being handled by Mr. Dunham. Persons to be solicited were selected at random, although a number of former purchasers of securities from each firm were invited to invest in the syndicate.

This method certainly constituted an offering to the ''public''. Corpus Juris states that the word does not have a fixed or definite meaning; in one sense ''the word does not mean all the people, nor most of the people, nor very many of the people of a place, but so many of them as contradistinguishes them from a few''. (50 C. J. 844, 845.) Webster's New International Dictionary, second edition, gives among other definitions of the word, ''a particular body or section of the people; often specifically, a clientele''. While the group solicited by defendants in this case was a comparatively small one, it nevertheless constituted the ''public'' so far as the purposes of the Corporate Securities Act are concerned. Sales were made in pursuance of a general plan to dispose of a substantial portion of the beneficial interest in the trust for the purpose of raising capital to carry out the venture. This, in the absence of a permit, constituted a violation of the Corporate Securities Act (*People* v. *Craven, supra; Black* v. *Solano County,* 114 Cal. App. 170 [299 Pac. 843]).

Because of the breach of statutory duty Bayly Brothers, Inc., and Edwards & Wildey Company are each liable to the plaintiffs as issuers of the security. Harold Bayly and

Roy D. Bayly are equally responsible for any damages caused thereby. Each of these persons as an officer of Bayly Brothers, Inc., actively participated in the sale of the certificates and the court found upon substantial evidence that "the entire enterprise, including the financing required therefor and the manner in which the same was carried out, was undertaken and carried on with the knowledge and upon the authority of Harold Bayly and Roy D. Bayly, and without their sanction thereof and their participation therein, the same would not have been undertaken or accomplished. . . . " Under these circumstances they are liable to the plaintiffs. (*Randall* v. *California L. B. Syndicate,* 217 Cal. 594 [20 Pac. (2d) 331]; *Walker* v. *Harbor Realty etc. Corp.,* 214 Cal. 46 [3 Pac. (2d) 557]; *O'Connell* v. *Union Drilling etc. Co.,* 121 Cal. App. 302 [8 Pac. (2d) 867]; *McClory* v. *Dodge,* 117 Cal. App. 148 [4 Pac. (2d) 223].)

California Trust Company is also liable because of its participation in the "general scheme" to issue and sell the certificates. The evidence shows that it took a prominent part in the financial plans of the promoters. Indeed, they could not have financed their enterprise without the assistance of the trust company. It prepared the certificates to be used in making assignments of interest and had them printed. It assisted in the transfer and delivery of the certificates, communicating in writing with various subscribers for the purpose of getting the papers in acceptable form. The check of $22,500 given by Mary Pickford Company as the balance of the subscription for the beneficial interest was made payable to it. It is well settled that where there is a common plan or design to commit a tort, all who participate therein are jointly liable, whether they actually commit the wrongful acts or not. (*Revert* v. *Hesse,* 184 Cal. 295 [193 Pac. 943]; *Burckhardt* v. *Woods,* 124 Cal. App. 345 [12 Pac. (2d) 482]; *Mox Inc.* v. *Woods,* 202 Cal. 675 [262 Pac. 302]; *Boston* v. *Simmons,* 150 Mass. 461 [23 N. E. 210, 15 Am. St. Rep. 230, 6 L. R. A. 629]; *Purington* v. *Hinchliff,* 219 Ill. 159 [76 N. E. 47, 109 Am. St. Rep. 322, 2 L. R. A. (N. S.) 824]; *Green* v. *Davies,* 182 N. Y. 499 [75 N. E. 536, 3 Ann. Cas. 310]; *Martens* v. *Reilly,* 109 Wis. 464 [84 N. W. 840].)

The conclusions just stated are not contrary to those reached in *Fox-Woodsum Lumber Co.* v. *Bank of America, etc.,* 7 Cal. (2d) 14 [59 Pac. (2d) 1019], *Vandervort* v. *Farmer's etc. Nat. Bank,* 7 Cal. (2d) 28 [59 Pac. (2d) 1028], and *Miller*

v. *Union Bank & Trust Co.*, 7 Cal. (2d) 31 [59 Pac. (2d) 1024]. In the last case the question of the liability of the bank arose upon demurrer to a complaint which alleged that it "issued and sold" the securities there involved. The decision necessarily assumes those facts, but the defendants point out that exhibits attached to the complaint show the issuance and sale of fractional parts of a trust interest in substantially the same form as the transaction complained of in the present case. If it be assumed that these exhibits could negative the allegations of the complaint, it is sufficient to point out that no contention was made that the assignments of fractional interest constituted the issuance of a new security. In all of these cases the court proceeded upon an assumption that the defendant bank issued the securities which were sold to the public.

The trust company also contends that the plaintiffs should not be allowed to change their position to its injury because it paid out the escrowed money in 1925. That defense rests upon equitable principles and was rejected by the trial court which found that it would not be inequitable or unjust to subject the defendants to liability. The evidence supports such finding and fully justifies it.

Another defense urged by the defendants is that the terms of the subscription agreement estop plaintiffs from recovery. Although by that instrument Edwards & Wildey Company was made the manager of the property with full power and authority to act for the syndicate, this did not bring the parties *in pari delicto*. The rule has been stated in *Randall* v. *California Land Buyers Syndicate, supra*, as follows: "Although the parties seeking affirmative relief, i. e., the buyers of such stocks, may be in some degree guilty with the parties against whom the relief is sought, they will be denied relief only where the record shows that they are equally culpable (*Campbell* v. *Julian Merger Mines*, 111 Cal. App. 649 [295 Pac. 1040]) ; and, considering the object and purpose of the Corporate Securities Act, mere knowledge of the terms of the permit or of the fact that no permit has been issued, may not alone be sufficient to raise the guilt of the purchaser or subscriber to that degree." (Page 598.)

Suburban Estates, Inc., stands in the same position as Bayly Brothers, Inc., and Edwards & Wildey Company. Apparently it served principally as a conduit to transfer title to the real estate. However, it was so closely connected

with the transaction sued upon that it is liable to the same extent as its co-defendants.

A more difficult question is presented by the contention of the defendants that the causes of action alleged in the first and fourth counts are barred by the statute of limitations. In these counts the plaintiffs allege that the certificates of beneficial interest were issued without a permit from the commissioner of corporations; that they are, therefore, void and that the defendants are entitled to recover the amount invested with interest from the day of payment. During the trial the plaintiffs conceded that their causes of action under these counts were not based upon any express representation that a permit had been issued by the commissioner of corporations or that the trust certificates were valid but were established by proof that the security sold to them was issued without a permit therefor.

The findings on this aspect of the case recite that the plaintiffs believed that the subscription agreement and the beneficial interests issued pursuant thereto were valid and genuine, that they relied upon that belief in signing the agreement and paying the purchase price for the certificates, and that the certificates of beneficial interest in the trust were and are void and worthless. There are no findings that the defendants acted with knowledge that a permit was required or that they acted recklessly and without reasonable grounds for believing that the securities were valid. The absence of any findings upon these essential elements of a fraud cause of action was compelled by the state of the record. There is affirmative and uncontradicted proof that the defendants responsible for the issuance and sale of the certificates carefully considered the question of the necessity for a permit and honestly believed that none was required. They entrusted the legal details of the enterprise to competent and experienced attorneys, who, upon a consideration of all the facts, concluded that the trust interests proposed to be sold were not securities within the meaning of the Corporate Securities Act. Under these circumstances a finding that the defendants had no reasonable ground for believing that the certificates were valid would not have been supported by the evidence. The plaintiffs insist, however, that the sale of a ''security'' as defined by the Corporate Securities Act, *supra*, without a permit therefor, implied fraud regardless of the seller's good faith and gives the buyer a cause of ac-

tion for the recovery of the amount paid by him which is not barred until three years after he discovers that no permit was in fact issued. The defendants contend that the action under counts 1 and 4 does not sound in fraud and having accrued when the securities were sold, it is now barred by the statute of limitations.

At common law it was the rule that in a sale of securities the seller impliedly warrants that they are genuine and are legally what they purport to be. The Supreme Court of the United States has said that where there is no statute to the contrary, the obligation of the vendor is not restricted to the mere question of forgery *vel non*, but requires him to deliver that which he has contracted to sell. The vendor, by the principal contract itself and not because of a collateral contract of warranty, must give the purchaser that which is genuine. (*Meyer* v. *Richards*, 163 U. S. 385 [16 Sup. Ct. 1148, 41 L. Ed. 199].) This case was followed by the Supreme Court of Oklahoma in an action brought by a bank to recover the purchase price of state warrants which were invalid. These warrants purported to have been drawn upon a special fund of the state but had been issued without authority of law. It was held that as the bank which sold them impliedly warranted that the securities were what they purported to be, it could not recover because the purchaser was entitled to have warrants that were valid and existing obligations of the state. (*Logan County Bank* v. *Farmers Nat. Bank*, 55 Okl. 592 [155 Pac. 561, at pp. 562, 563].) This rule is fully in accord with the warranties which are implied in the assignment of choses in action. (See Restatement of Contracts, sec. 175 (1), (b), (c); Fletcher Encyclopedia of Corporations, Perm. Ed., vol. 12, sec. 5616, p. 744.)

When the transaction which is the subject of the present litigation occurred, section 1774 of the Civil Code provided that "One who sells or agrees to sell an instrument purporting to bind anyone to the performance of an act thereby warrants that he has no knowledge of any facts which tend to prove it worthless, such as . . . its invalidity for any cause." This section limited the rule of the common law and was held to be exclusive. (*Sutro* v. *Rhodes*, 92 Cal. 117, 124 [28 Pac. 98]; *Harvey* v. *Dale*, 96 Cal. 160 [31 Pac. 14]; *Crocker-Woolworth Nat. Bank* v. *Nevada Bank*, 139 Cal. 564, 585 [73 Pac. 456, 96 Am. St. Rep. 169, 63 L. R. A. 245].) It was repealed in 1931.

Although by these decisions the common-law warranty applicable to a sale of securities was limited in this state, nevertheless because of the provisions of the Corporate Securities Act, *supra*, in effect at the time of the transaction here in controversy, a seller of securities necessarily warranted that the duties therein imposed upon him had been performed. Such a warranty is based upon the obligation to secure a permit which the law enjoined upon the seller.

Warranties implied by sellers' statutory duties are not unknown to the common law. The case of *Smith* v. *Luning*, 111 Cal. 308 [43 Pac. 967], well illustrates the rule. There the parties had entered into a contract to build a sewer in front of a lot. By an ordinance then in force, it was unlawful to build such a sewer without first securing a permit from the superintendent of streets. The court held: "As the obtaining a permit from the superintendent of streets was essential to rendering the agreement between the plaintiff and defendant valid and as the instrument in question is silent upon that subject, the obtaining of such a permit must be implied as a condition of the agreement between them. . . . " In *Smith & Co.* v. *Etheridge*, 190 N. C. 162 [129 S. E. 453], the action was for damages claimed to have been suffered by reason of the breach of an implied warranty in the sale of commercial fertilizer. The court held that inasmuch as a statute required fertilizer to be properly analyzed and labeled, a warranty that the law had been complied with would be implied from the sale. The seller's express refusal to give an express warranty did not relieve him of this obligation. In each of these cases the court applied the general and well-established rule that "all applicable laws in existence when a contract is made necessarily enter into it and form a part of it as fully as if they were expressly referred to and incorporated in its terms". (6 Cal. Jur., pp. 310, 311.)

█ Whenever, therefore, an issuer or underwriter of securities offers them for sale to the public, he impliedly represents that the applicable provisions of law have been complied with. The falsity of that representation may give rise to an action either for breach of warranty or for fraud depending upon the culpability of the seller in the particular transaction. "The representation of fact which induces a bargain is a warranty. In truth, the obligation imposed upon the seller in such a case is imposed upon him not by virtue of his agreement to assume it, but because of a rule of law

applied irrespective of agreement. The obligation in such a case is *quasi* contractual, and at least if the seller knows the falsity of his representation there is also a tort.'' (Williston on Contracts, Revised Ed., vol. 5, sec. 1505, p. 4198.)

 The obligation of a warranty is absolute, and is imposed as a matter of law irrespective of whether the seller knew or should have known of the falsity of his representations. Fraud, on the other hand, involves the additional requirement that the seller knew, or, in the exercise of reasonable diligence should have known, that his representations were false.

The case of *Shippen* v. *Bowen,* 122 U. S. 575 [7 Sup. Ct. 1283, 30 L. Ed. 1172], aptly illustrates the basic distinction. There the plaintiff sued for breach of express warranty in the sale of certain bonds, alleging that the defendant had falsely represented the bonds to be valid and genuine whereas they were in fact spurious. The complaint also contained allegations essential to support an action for deceit; i. e., that the defendant, who was the seller, knew the representations to be false. The trial court instructed the jury that the plaintiff could not recover unless he established scienter in the defendant. The court held that such an instruction was erroneous and that the plaintiff was entitled to recover upon the warranty without alleging or proving scienter.

The distinction is likewise well established in California. In 22 California Jurisprudence, p. 960, it is said: ''While the fact that the defendant acted with superior knowledge is the gist of the action, whether it be one on the case for false representation or upon contract for breach of warranty, there is, in theory at least, a plain distinction between fraud and warranty in respect to the degree of the defendant's knowledge. To support the action for deceit, the plaintiff must prove that the defendant was aware of the falsity of his statement, or at any rate, that he spoke with a conscious lack of knowledge as to the truth, whereas, to the maintenance of an action for breach of warranty, it is not essential to show that the seller consciously misstated the fact as to the quality, fitness or value of the goods or thing; the plaintiff need only establish an assumption by the seller of superior knowledge as to the fact,—a state of mind which is perfectly consistent with good faith or a belief in the truth of the statement.'' (See *Spiegelman* v. *Eastman,* 95 Cal. App. 205, 216 [272 Pac. 761]; *Pacific Feed Co.* v. *Kennel,* 63 Cal. App. 108 [218

Pac. 274]; *Brock* v. *Newmark Grain Co.*, 64 Cal. App. 577 [222 Pac. 195]; *Hackett* v. *Lewis*, 36 Cal. App. 687 [173 Pac. 111]; *Pepper* v. *Vedova*, 26 Cal. App. 406 [147 Pac. 105].)

The allegations of the first and fourth cause of action in the present case present facts showing a sale of securities upon an implied warranty which was untrue. That warranty was broken at the time of the sale and the statute of limitations commenced to run at that time. "The typical warranty, being an undertaking regarding the quality of goods at the time of their sale must, if ever broken, be broken at that time; and the statute of limitations, therefore, begins to run immediately." (Williston on Sales, 2d ed., vol. 1, sec. 212a, p. 411.) (See note, 75 A. L. R. 1086.) The causes of action for breach of warranty were, therefore, barred long prior to the commencement of the action.

The respondents, however, contend that the allegations of their complaint concerning the issuance of the certificates of beneficial interest without a permit therefor state a cause of action for fraud which, they say, is implied from the facts concerning the particular transaction in controversy. Although in a number of cases, the appellate courts of this state have said that a seller of securities in contravention of the Corporate Securities Act, *supra*, is guilty of fraud, in all but two of these cases a recovery might have been had for breach of warranty. In *MacDonald* v. *Reich & Lievre, Inc.*, 100 Cal. App. 736 [281 Pac. 106], it was held that an action for money had and received brought to recover the consideration paid for stock which was issued and sold without a permit, sounded basically in fraud or mistake, and although more than four years had elapsed since the stock had been sold, the action having been commenced within a reasonable time after the plaintiff's discovery of the seller's lack of a permit, and within three years thereafter, it was not barred by the statute of limitations. The case of *Klombies* v. *Weeks Poultry Community*, 121 Cal. App. 175 [8 Pac. (2d) 940], involved an action by a buyer to recover purchase money paid to a seller who failed to comply with the requirements of the permit. The court held that the buyer's cause of action sounded in fraud and therefore accrued at the time he discovered the seller's dereliction, and was not barred by sections 339 and 340 of the Code of Civil Procedure. These cases were decided upon the theory that the buyer of securities sold

without a permit has a cause of action for fraud under all circumstances. They are, therefore, at variance with the conclusions now stated and are overruled.

*Boss* v. *Silent Drama Syndicate*, 82 Cal. App. 109, 112 [255 Pac. 225]; *Hemmeon* v. *Amalgamated C. Mines Co.*, 95 Cal. App. 400 [273 Pac. 74]; *Michaels* v. *Pacific Soft Water Laundry*, 104 Cal. App. 349 [286 Pac. 165, 1071]; *McClory* v. *Dodge*, 117 Cal. App. 148 [4 Pac. (2d) 223]; *O'Connell* v. *Union Drilling etc. Co.*, 121 Cal. App. 302 [8 Pac. (2d) 867]; *Belden* v. *California Fireproof Storage Co.*, 140 Cal. App. 706 [35 Pac. (2d) 1034]; *Walker* v. *Harbor Realty etc. Corp.*, 214 Cal. 46, 49 [3 Pac. (2d) 557]; *Gillis* v. *Pan-American Western Pet. Co.*, 3 Cal. (2d) 249, 256 [44 Pac. (2d) 311], also state the implied fraud doctrine, but none of those cases involved the bar of the statute of limitations and the language used was not necessary to the result reached. These cases failed to note the well-established distinction between fraud and breach of warranty which has heretofore been pointed out, and in so far as the opinion in any one of them contains language to the effect that implied fraud will be conclusively presumed from the sale of securities in violation of the Corporate Securities Act, *supra*, it is overruled.

In the case of *Young* v. *Three For One Oil Royalties*, 1 Cal. (2d) 639 [36 Pac. (2d) 1065], the plaintiffs sued to recover the amounts paid for certain certificates of beneficial interest in a common-law trust which, it was alleged, were issued in violation of the Corporate Securities Act. This suit was filed six years after the sales were made. The superior court found that none of the defendants represented that a permit had been issued, or concealed any fact from the purchasers, or practiced any fraud upon any of them; that inquiry was made of the corporation commissioner concerning the necessity for a permit and that officer ruled that it was not necessary. Upon these findings the trial judge ruled that the cause of action was barred by the statute of limitations. Upon appeal this court held that no permit for the issuance or sale of the certificates bought by the plaintiffs was necessary, and affirmed the judgment upon that ground. Although urged to state what the applicable statute of limitations is in such a case, it left that question to be later determined.

The theory of allowing a buyer of void certificates of stock to recover their value upon the ground of fraud was first

applied in this state in the case of *Green* v. *Caribou Oil Min. Co.*, 179 Cal. 787 [178 Pac. 950], which did not involve a violation of the Corporate Securities Act. The evidence relied upon by the plaintiff in that action showed that a vice-president of the corporation whose stock was sold negligently signed several certificates. The secretary of the corporation issued them to himself without any authority therefor and passed them on to an innocent purchaser. This court held the corporation liable for the amount paid by the plaintiff because the culpable negligence of the vice-president amounted to actual fraud. In the course of the opinion it said that the "false issue . . . is a representation by the corporation itself to the purchaser from the original holder that the false stock is genuine". This statement is entirely proper as applied to the facts of that case, where negligent fraud had been affirmatively proved, but is not authority for holding that one who issues a security without the required permit of the commissioner of corporations is conclusively guilty of implied fraud.

There are other decisions of the appellate courts of this state giving relief to buyers of void securities which, on principle, are not founded either upon fraud or breach of warranty. For example, the case of *Pollak* v. *Staunton*, 210 Cal. 656 [293 Pac. 26], was commenced by a buyer of securities sold without a permit. He charged one who participated in the sale upon a common count for money had and received. The defendant was held liable for the amount of the consideration received by him upon the theory that the plaintiff was entitled to recover upon a *quasi* contract. In other cases the cause of action sued upon sounded in tort and was based upon the seller's breach of a statutory duty. It has been held that a buyer of securities may recover damages notwithstanding his knowledge of the seller's lack of or noncompliance with a permit provided only he is not *in pari delicto* with the seller. (*Randall* v. *California Land Buyers Syndicate*, 217 Cal. 594 [20 Pac. (2d) 331] ; *Duntley* v. *Kagarise*, 10 Cal. App. (2d) 394 [52 Pac. (2d) 560] ; *Olds* v. *Simmons*, 123 Cal. App. 275 [11 Pac. (2d) 36] ; *Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271] ; *Campbell* v. *Julian Merger Mines*, 111 Cal. App. 649 [295 Pac. 1040] ; *Parrish* v. *American Ry. Emp. Pub. Corp.*, 83 Cal. App. 298 [256 Pac. 590].) In *Randall* v. *California Land Buyers Syndicate, supra,* it was said : "Al-

though the parties seeking affirmative relief, i. e., the buyers of such stocks, may be in some degree guilty with the parties against whom the relief is sought, they will be denied relief only where the record shows that they are equally culpable (*Campbell* v. *Julian Merger Mines,* 111 Cal. App. 649 [295 Pac. 1040]) ; and considering the object and purpose of the Corporate Securities Act, mere knowledge of the terms of the permit or of the fact that no permit has been issued, may not alone be sufficient to raise the guilt of the purchaser or subscriber to that degree.'' ▮ It is obvious that a buyer who knows that the seller is violating the provisions of the statute may not recover from that seller on a theory that he had relied upon an implied representation that the security was validly issued and sold.

▮ It is likewise clear that a fraudulent transaction can be ratified by acquiescence of the party defrauded with full knowledge of the facts, but a purchaser of void securities is given relief against the seller notwithstanding acquiescence with full knowledge. The seller cannot assert that the purchaser has ratified the void transaction (*First Nat. Bank* v. *Thompson,* 212 Cal. 388 [298 Pac. 808] ; *Reno* v. *American Ice Machine Co.,* 72 Cal. App. 409 [237 Pac. 784] ; *Pollak* v. *Staunton,* 210 Cal. 656, 663 [293 Pac. 26] ; *Olds* v. *Simmons, supra; Tatterson* v. *Kehrlein,* 88 Cal. App. 34 [263 Pac. 285].) The recovery in these situations has been based upon the principle that stock issued in violation of the Corporate Securities Act is void for illegality, and the purchaser, not being *in pari delicto,* may recover the consideration in an action upon *quasi* contract.

Analogous cases in other branches of the law have likewise established principles which are not wholly consistent with the conclusive implied fraud doctrine announced in some of the corporate securities cases. The California Usury Law (Stats. 1919, p. lxxxiii; Deering's General Laws, 1937 ed., vol. 2, Act 3757) provides that where a contract is usurious, the agreement to pay interest is void. An action to recover interest paid in violation of this law is held to be merely ''the common-law remedy to recover money paid under illegal provisions of a contract'' under which the plaintiff is entitled to recover interest paid ''within two years of the suit''. (*Taylor* v. *Budd,* 217 Cal. 262 [18 Pac. (2d) 333].) Likewise in *Smith* v. *Bach,* 53 Cal. App. 63 [199 Pac. 1106], the defendants violated a statute making it unlawful to sell land

by reference to an unrecorded map. In a suit by purchasers to recover the consideration paid it was held that the contract of sale was void, and that the purchasers could recover all payments except those made more than two years prior to the commencement of the suit. While it is true that the action was one in *assumpsit* and the complaint did not charge fraud, still the court was of the opinion that the cause of action to recover payments made for land sold in violation of a statute making such a sale void was barred in two years.

The respondents also contend that the issuance of a security without a permit constitutes constructive fraud within the meaning of section 1573 of the Civil Code which defines it as: " . . . any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him". However, this section states the rule applicable in confidential relations. It has never been applied to fix liability for the breach of a statutory duty except that of a fiduciary, and in the early case of *Feeney* v. *Howard,* 79 Cal. 525 [21 Pac. 984, 12 Am. St. Rep. 162, 4 L. R. A. 826], this court held that it is essential to the operation of the principle of constructive fraud that there be a fiduciary relation. "It is one of the facts constituting the fraud," said the court in that case. This is in accord with fundamental principles. "To constitute positive or actual fraud there must be such fraud as affects the conscience, that is, there must be an intentional deception. Constructive fraud, on the other hand, is presumed from the relation of the parties to a transaction, or the circumstances under which it takes place. . . . Constructive fraud often exists where the parties to a contract have a special confidential or fiduciary relation, which affords the power and means to one to take undue advantage of, or exercise undue influence over, the other." (12 R. C. L. 230, 231, 232.)

Upon a full consideration of the applicable principles of law, it is clear that a person who sells a security impliedly represents that a permit therefor has been secured when one is required by the Corporate Securities Act for such a sale. If this implied representation is false, then it is a negligent misrepresentation which is an actionable fraud, and the buyer's right of action does not accrue until he

discovers its falsity unless the seller acted upon information sufficient to justify a reasonable man in concluding that no permit was required. In that event there has been a breach of warranty, but no fraud, and the buyer's cause of action accrues at the date of the sale.

Because of the representations made by Bayly Brothers, Inc., which amounted to fraud, the plaintiffs are entitled to recover from it the amount paid for the beneficial interest in the trust with interest thereon from the date of payment. The evidence shows that the false representations were made by J. W. Dunham, the executive vice-president of the corporation, and it does not appear that either Harold Bayly or Roy D. Bayly participated in or were aware of the fraud which induced the plaintiffs to buy their certificates. Hence on the present record the two Bayly brothers cannot be held individually liable, but the judgment against the corporation must stand with interest on the amounts paid by the plaintiffs from the dates of such payments.

The judgment against Bayly Brothers, Inc., is modified by allowing interest at the rate of 7 per cent per annum on the sum of $2,500 from October 31, 1925, and on the sum of $22,500 from December 12, 1925, and as so modified it is affirmed; the judgment as against all other defendants is reversed; the appeal from the order denying the motion of the plaintiffs to set aside and vacate the judgment and to render another and different judgment is dismissed for the reason that the relief sought thereby has been granted in part and denied in part by the determination of the appeal from the judgment; the appeal from the order denying a similar motion made on behalf of Harold Bayly and Roy D. Bayly is dismissed for the reason that the questions presented by it have also been decided upon the appeal from the judgment. The plaintiffs will recover costs on appeal as against Bayly Brothers, Inc. The defendants Edwards & Wildey Company, Suburban Estates, Inc., and California Trust Company, will recover costs on appeal as against the plaintiffs. Harold Bayly and Roy D. Bayly will not recover any costs on appeal.

Houser, J., deeming himself disqualified, did not participate in the foregoing opinion.

Rehearing denied. Langdon, J., voted for a rehearing.